1  STEVEN G. KALAR
Federal Public Defender
2  HANNI M. FAKHOURY
Assistant Federal Public Defender
3  1301 Clay Street, Suite 1350N
Oakland, CA 94612
4  (510) 637-3500
hanni_fakhoury@fd.org
5

6  Attorneys for DUMAKA HAMMOND

7

8                    UNITED STATES DISTRICT COURT

9            FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                       OAKLAND DIVISION

11  UNITED STATES OF AMERICA,              )   CR 16-102-JD
                                           )
12                          Plaintiff,     )   MOTION TO SUPPRESS STATEMENTS
                                           )
13         v.                              )
                                           )   Date:  September 8, 2016
14  DUMAKA HAMMOND,                        )   Time: 10:30 a.m.
                                           )
15                          Defendant.     )
                                           )
16  _____       )

17  TO:   **BRIAN STRETCH, UNITED STATES ATTORNEY; AND
          THOMAS R. GREEN, ASSISTANT UNITED STATES ATTORNEY:**
18

19         PLEASE TAKE NOTICE that the defendant DUAMAKA HAMMOND hereby moves this

20  Court for an order suppressing the statements he gave to the FBI on July 17, 2015.  This motion will

21  be heard on September 8, 2016 at 10:30 a.m. in Courtroom 11, on the 19th Floor of the San Francisco

22  Courthouse.

23         This motion is based on this notice and motion, the attached memorandum of points and

24  authorities and accompanying exhibits, the United States Constitution, *Miranda v. Arizona*, 384 U.S.

25  436 (1966), *United States v. Craighead*, 539 F.3d 1073 (9th Cir. 2008), all other applicable

26  constitutional, statutory and case authority and such evidence and argument that may be presented at

27  the motion hearing.

28

# **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................... 1

STATEMENT OF FACTS ............................................................................................................. 1

A.     The FBI's Investigation of Playpen and Search of 678 7th Street in Richmond. .................. 1

B.     Execution of the Search Warrant and Mr. Hammond's Interrogation. .................................. 2

ARGUMENT .................................................................................................................................. 6

A.     Mr. Hammond Was in "Custody" When Interrogated by the FBI. ........................................ 7

     1.     Seventeen Law Enforcement Personnel from Four Different Agencies Created a Police Dominated Presence in Mr. Hammond's Apartment. ................................ 8

     2.     Mr. Hammond Was Restrained By Handcuffs and Escorted at All Times. ............... 9

     3.     Mr. Hammond Was Isolated From Family Members During Questioning.............. 10

     4.     Although Told He Could Leave, a Reasonable Person in Mr. Hammond's Position Would Not Have Felt Free to Leave. ......................................................... 11

B.     Since Mr. Hammond Was Subjected to Custodial Interrogation Without Being Advised of His *Miranda* Rights, His Verbal and Written Statements Must be Suppressed. ............................................................................................................................. 13

CONCLUSION ............................................................................................................................. 14

1

**TABLE OF AUTHORITIES**

2

**Cases**

3

*Miranda v. Arizona*, 384 U.S. 436 (1966) ............................................................................... *passim*

4

*Rhode Island v. Innis*, 446 U.S. 291 (1980) ................................................................................ 6

5

*Smith v. Clark*, 612 F. App'x 418 (9th Cir. 2015) ...................................................................... 12

6

*Smith v. Clark*, 804 F.3d 983 (9th Cir. 2015) ............................................................................ 12

7

*Thompson v. Keohane*, 516 U.S. 99 (1995) ............................................................................ 6, 11

8

*United States v. Blanford*, 467 F. App'x 624 (9th Cir. 2012) .................................................. 13

9

*United States v. Clymer*, 524 F. App'x 354 (9th Cir. 2013) ..................................................... 13

10

*United States v. Craighead*, 539 F.3d 1073 (9th Cir. 2008) .............................................. *passim*

11

*United States v. Durazo*, 2014 WL 217895 (D. Ariz. Jan. 21, 2014) ................................. 11, 13

12

*United States v. Gladney*, 2009 WL 175157 (C.D. Cal. Jan. 23, 2009) ..................................... 9

13

*United States v. Howard*, ___ F. Supp.3d ___, 2016 WL 97448 (N.D. Cal. Jan. 8, 2016) .............. 12

14

*United States v. McKany*, ___ F. App'x ___, 2016 WL 2587540 (9th Cir. May 5, 2016) .............. 13

15

*United States v. Mittel-Carey*, 493 F.3d 36 (1st Cir. 2007) ............................................... 10, 13

16

*United States v. Perez*, 2012 WL 2935657 (D. Guam Jul. 17, 2012) ...................................... 10

17

*United States v. Richardson*, 36 F. Supp.3d 120 (D.D.C. 2014) ............................................ 13

18

*United States v. Salabye*, 623 F. Supp.2d 1010 (D. Ariz. 2009) ............................................ 13

19

*United States v. Warras*, 2015 WL 6736981 (D. Nev. May 18, 2015) (Ferenbach, M.J.)

20

  *R. & R. adopted* 20105 WL 6755275 (D. Nev. Nov. 4, 2015) (Dawson, D.J.) ..................... 12, 13

21

**Statutes**

22

18 U.S.C. § 2252(a)(4)(B) ............................................................................................................ 6

23

**Constitutional Provisions**

24

U.S. CONST. AMEND. V ................................................................................................................. 6

25

26

27

28

1

**INTRODUCTION**

2      When seventeen different law enforcement agents from four different agencies—some of

3 whom were armed—entered Mr. Hammond's apartment on July 17, 2015 to execute a search

4 warrant, he was a man trapped in his own home.  As the lead FBI agent questioned Mr. Hammond

5 without reading him his *Miranda* rights, Mr. Hammond had nowhere to go.  Although the lead agent

6 told Mr. Hammond he could leave, the facts and circumstances of the FBI's presence in Mr.

7 Hammond's apartment gave a very different impression.  "If a reasonable person is interrogated

8 inside his own home and told he is 'free to leave,' where will he go?  The library?  The police station?

9 He is already in the most constitutionally protected place on earth.  To be 'free' to leave is a hollow

10 right if the one place the suspect cannot go is his own home."  *United States v. Craighead*, 539 F.3d

11 1073, 1083 (9th Cir. 2008).

12      Mr. Hammond found himself in this precise dilemma.  His home was dominated by law

13 enforcement, as their overwhelming presence isolated Mr. Hammond and restrained his freedom of

14 movement.  The effect was to place Mr. Hammond in "custody," triggering the FBI's obligation

15 under *Miranda v. Arizona*, 384 U.S. 436 (1966) to warn Mr. Hammond of his right to remain silent

16 and have an attorney present before answering any questions.  Since Mr. Hammond was not advised

17 of his *Miranda* rights before being interrogated by the FBI, all of his oral and written statements must

18 be suppressed.

19

**STATEMENT OF FACTS**

20      The facts concerning the Playpen investigation and how the FBI ultimately obtained a search

21 warrant for Mr. Hammond's residence in Richmond are recounted in more detail in the previously

22 filed motion to suppress the NIT warrant for violating Federal Rule of Criminal Procedure 41.  *See*

23 Doc. 19, Motion to Suppress NIT Warrant at p. 2-7.  This motion incorporates the facts of that

24 motion.

25 **A.      The FBI's Investigation of Playpen and Search of 678 7th Street in Richmond.**

26      In September 2014 the FBI began investigating a child pornography website known as

27 "Playpen," which was accessible only on the Tor network.  Doc. 19 at p. 2-3.  The Tor network

28 allows users and websites to operate on the Internet without revealing their location or other

-1-

1    identifying information. *Id.* at 2. In December 2014, the FBI learned the Playpen website was hosted

2    on a server in North Carolina, and seized the server with a search warrant. Instead of shutting down

3    Playpen, however, the FBI copied the information from the seized server, including the child

4    pornography, onto a government-controlled server in Virginia in order to operate the site itself. *Id.*

5    at p. 3.

6         In February 2015, the government obtained a search warrant from a magistrate judge in the

7    Eastern District of Virginia to continue operating the Playpen site for thirty days. *Id.* at p. 3-5. To

8    identify the anonymized visitors to the site, the government sought to deploy a Network Investigative

9    Technique ("NIT"), specialized software surreptitiously installed onto the computers of visitors to

10   the Playpen site which would cause individual computers to covertly send identifying information

11   about the computers back to the FBI. Although permitted to deploy the NIT for thirty days, the

12   government operated Playpen and deployed the NIT from February 20 to March 4, 2015, before

13   shutting the operation down. *Id.*

14        Based on information obtained through the NIT, the government identified numerous IP

15   addresses that visited the Playpen site during the time it was operated by the government. One of

16   those IP address was associated with 678 7th Street in Richmond, which was ultimately determined

17   to be Mr. Hammond's residence. On July 16, 2015, FBI Special Agent Robert Basanez submitted

18   an application and affidavit for a search warrant to Northern District of California Magistrate Judge

19   Maria-Elena James, seeking authorization to search Mr. Hammond's apartment.[1]  Judge James

20   signed the warrant that same day. *Id.* at p. 5-7.

21   **B.       Execution of the Search Warrant and Mr. Hammond's Interrogation.**

22        On July 17, 2015, the FBI went to Mr. Hammond's apartment at 6:00 am to execute the

23   search warrant. *See* Exhibit A, July 28, 2015 FBI 302 Report of Investigation. There were a total of

24   seventeen law enforcement agents conducting the search of Mr. Hammond's residence from four

25   different law enforcement agencies: twelve FBI agents, two U.S. Postal Inspectors, one Contra Costa

26   County District Attorney Senior Investigator, and two marked Richmond police department cars at

27   _____
     [1] After filing the motion to suppress the NIT warrant, counsel for Mr. Hammond realized that the
28   motion incorrectly identified Mr. Hammond's address as 678 8th Street; it should be 678 7th Street.

1    the scene of the search, presumably with at least one Richmond police officer accompanying each

2    car. *Id.*

3        At the time the FBI knocked on Mr. Hammond's door, he was in the bathroom and was not

4    wearing a shirt.  Exhibit B, Declaration of Dumaka Hammond, at ¶ 3.  He heard banging on the door

5    and someone yelling "open up, open up, FBI search warrant."  *Id.*  When Mr. Hammond came out

6    of the bathroom, the agents were entering the house and he saw at least one officer holding a gun.

7    *Id.* at ¶ 4.  He was taken to the front porch of the house where he saw the other occupants of the

8    house—his mother Mary Smith-Hammond, his sister Chantel Toliver, and her 14 year old

9    daughter—handcuffed on the porch.  *Id.* at ¶¶ 2, 5.  Mr. Hammond was handcuffed and taken outside

10   to the front porch too.  *Id.* at ¶ 5.  After the agents did a five to ten minute protective sweep of the

11   apartment, they led everyone back into the family room of the apartment.  Officers took the handcuffs

12   off of everyone except Mr. Hammond.  *Id.* at ¶ 7.  They then separated Mr. Hammond's mother and

13   took her into a room where she was interviewed by FBI officers.  *Id.* at ¶ 8.  In the meantime, Mr.

14   Hammond waited on a couch in the family room with his sister and niece.  *Id.*

15       After a few more minutes, agents took Mr. Hammond into his bedroom to interrogate him.

16   They removed the handcuffs and had Mr. Hammond sit on his bed which was located opposite the

17   wall with the sole door into the room.  *Id.* at ¶ 9.  As Mr. Hammond sat on one end of the bed, Agent

18   Basanez sat next to Mr. Hammond on the bed.  *Id.* at ¶ 11.  Two other FBI agents, with holstered

19   firearms, stood with their backs towards the wall with the door into the bedroom, effectively blocking

20   Mr. Hammond from leaving the room.  *Id.*  The door to the bedroom was closed.  *Id.* at ¶ 10.

21       Agent Basanez began by telling Mr. Hammond "we really just want to talk to you, ask you a

22   few questions, but I want you to make sure you understand that you don't have to [answer]

23   questions."  Exhibit C, Transcript of July 17, 2015 Interrogation of Dumaka Hammond at 2.[2]  He

24   elaborated that he was not under arrest and would not be arrested that day.  *Id.*  After Mr. Hammond

25   explained that he needed to leave for work, Agent Basanez asked him "do you mind just talking to

26   us real quickly" and Mr. Hammond agreed.  *Id.* at 6.  Agent Basanez explained that the government

---

27   [2] Mr. Hammond has not lodged the actual audio recording of the interrogation with Mr. Hammond
     but can do so if the Court wishes to review it.

28

1   would get his computer back to him and the questioning began.  *Id.*  Critically, Agent Basanez did

2   not advise Mr. Hammond of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966) including that

3   he had the right to remain silent, that anything he said could be used against him in court, that he had

4   a right to have an attorney present with him during questioning and that an attorney could be

5   appointed to represent him if he was indigent.  *See* Exh. B at ¶ 12; Exh. C at 2, 6.

6         Agent Basanez's tone with Mr. Hammond was neither rude nor aggressive.  But he clearly

7   demonstrated to Mr. Hammond that he knew who he was.  *See* Exh. B at ¶ 13.  Agent Basanez knew

8   Mr. Hammond worked in computers.  *See* Exh. C at 8 ("And I think you're a network administrator,

9   is that?").  He knew Mr. Hammond was registered as a sex offender and his past criminal history,

10  including his jail sentence and county of conviction.  *Id.* at 8 ("Based on your past history that kind

11  of has an indication of why we're here.  You're you know…conviction of child pornography"); *id.*

12  at 9 ("I understand you're still registered sex offender, right?"); *id.* at 14 ("I thought you didn't serve

13  time?"); *id.* at 15 ("Who arrested you the first time? Was it Santa Clara?").

14        Agent Basanez repeatedly confronted Mr. Hammond with the evidence the FBI had against

15  him.  Agent Basanez told Mr. Hammond "we found a website and we found your information on

16  that website."  Exh. C at 9.  He elaborated, "the thing is that we know that your computer accessed

17  a website that has child pornography.  I mean, we know that.  Otherwise we wouldn't be here."  *Id.*

18  at 10.  He then told Mr. Hammond "I'll play the game with you.  I would tell you the name of your

19  PC."  *Id.* at 11.  He explained, "how would I know that?" and "I've never met you," before concluding

20  "I've got your case file, man."  *Id.* at 12.  He continued: "we know when you went on this website

21  and we know how long you spent on the website."  *Id.* at 20.   He told Mr. Hammond he knew the

22  last time Mr. Hammond logged on to the website, knew how many hours he had spent on the site

23  and "I even know what your username is."  *Id.* at 21, 23, 24.

24        Agent Basanez encouraged Mr. Hammond to talk truthfully because "the more truthful you

25  are the better it is for you in the long run, because what I'm going to do is I'm going to write a report,

26  and you know, take my notes and write a report.  And then you know, at the end of the day you know

27  the people above me that make this final call, they're going to call me and say you know, what was

28  this guy like?  Was he honest, was he truthful?  I'll be like the guy was straight up with me."  *Id.* at

16-17.  So Mr. Hammond answered all of the FBI's questions.  The "quick" interview Mr. Hammond thought he was going to have with the agents before going to work turned into a 65 minute interrogation.  He did not get his computer back; the FBI explained "we can't let you take the computer, because it's got possible child porn on it."  *Id.* at 49.  Agent Basanez suggested Mr. Hammond "call work and tell them that you lost it or something" and agreed with Mr. Hammond that he "might want to" call in sick to work that day.  *Id.* at 50; Exh. B at ¶ 14.  This interview took place while Mr. Hammond was not wearing a shirt.  Exh. B at ¶ 15; Exh. C at 56.

After approximately 45 minutes, Agent Basanez told Mr. Hammond the FBI needed to finish searching his room, as well as Mr. Hammond's car outside.  *Id*. at 56.  They had Mr. Hammond put a shirt on and all left the room.  *Id.*  Agent Basanez told Mr. Hammond:

> SPECIAL AGENT BASANEZ: So, I mean, you're obviously not a, going to be arrested, so if you need to go somewhere or you want to hang out, you know, the only thing is that we kind of, we want to get in and out real quick, so.
>
> MR. HAMMOND: I'm going to stick around just to give you guys any assistance.
>
> SPECIAL AGENT BASANEZ: Okay.  We're just going to have somebody kind of hanging out with you just for our safety.
>
> MR. HAMMOND: Okay.

*Id.* at 62.  Mr. Hammond told the agents he wanted to smoke a cigar, and they escorted him outside. Exh. B at ¶ 17; Exh. C at 62-63.  After getting a cigar from his car, Mr. Hammond sat on the steps of his front porch smoking while an agent stood at the bottom of the porch steps, blocking the gate to exit the apartment building.  Exh. B at ¶ 17.

Finally, Agent Basanez told Mr. Hammond "I don't really offer this to everyone, but I'm offering it to you because you have been so truthful with us."  Exh. C at 69.  His offer was to have Mr. Hammond give a written statement so he could say "hey, look, you know, I did X, Y or Z and I feel bad about it and I'm sorry, and you know, explain like your side of the story and apologize" since a statement "goes a long way."  *Id.*  Mr. Hammond took Agent Basanez's offer and provided a written statement.  *Id.* at 71-73; Exh. B at ¶ 18.

After the interrogation ended, Mr. Hammond waited on the couch in the family room with the rest of his family members until the FBI finished searching about an hour later.  Exh. B at ¶ 19.

1    Mr. Hammond was not arrested that day or charged with any crime.  Eight months later, a one count

2    indictment was filed on March 10, 2016, charging Mr. Hammond with possession of child

3    pornography in violation of 18 U.S.C. § 2252(a)(4)(B).  He was arrested that same day and has been

4    in custody since.

5                                                    **ARGUMENT**

6            The Fifth Amendment to the U.S. Constitution states that no person "shall be compelled in

7    any criminal case to be a witness against himself."  U.S. CONST. AMEND. V.  It is well-known that in

8    order to safeguard this constitutional right, law enforcement must advise criminal suspects of their

9    right to remain silent, warn them that anything they say could be used against them in court, explain

10   they have the right to have an attorney present during question, and that if they cannot afford an

11   attorney one can be appointed at no cost to them before questioning.  *Miranda v. Arizona*, 384 U.S.

12   436, 479 (1966).

13           *Miranda* warnings are required whenever a suspect is subjected to "custodial interrogation."

14   A person is in "custody" when he has been "deprived of his freedom of action in any significant

15   way."  *Id.* at 444.  That requires reviewing the totality of the circumstances to determine "whether a

16   reasonable person in those circumstances would 'have felt he or she was not at liberty to terminate

17   the interrogation and leave.'"  *United States v. Craighead*, 539 F.3d 1073, 1082 (9th Cir. 2008)

18   (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)).  "Interrogation" means either express

19   questioning or its functional equivalent reasonably likely to elicit an incriminating response from the

20   suspect.  *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

21           Here, there is no question that Mr. Hammond was "interrogated."  He was asked direct

22   questions by Agent Basanez and other FBI agents about whether he had used Tor and accessed

23   Playpen to view child pornography.  The questioning lasted for more than an hour and was clearly

24   designed to—and did—elicit incriminating responses from Mr. Hammond, including a detailed

25   written confession at the end of the interrogation.

26           Therefore, the only question here is whether Mr. Hammond was in "custody" and needed to

27   be advised of his *Miranda* rights before being interrogated by the FBI.  As explained below, the

28   answer is yes: Mr. Hammond was in "custody" notwithstanding the fact the interrogation took place

-6-

1    in his home.  Because Mr. Hammond did not feel free to terminate the encounter with Agent Basanez,

2    he should have been advised of his *Miranda* rights before speaking to the FBI.  In the absence of

3    *Miranda* warnings, his verbal and written statements to the FBI, including any signed consent forms

4    and any evidence obtained as a result of any verbal or written consent, must be suppressed.

5    **A.      Mr. Hammond Was in "Custody" When Interrogated by the FBI.**

6           The Ninth Circuit has noted the "analytical challenges" with applying *Miranda* safeguards—

7    and determining whether a person is in "custody"—during an interrogation that takes place at a

8    suspect's home.  A "reasonable person interrogated inside his own home may have a different

9    understanding of whether he is truly free 'to terminate the interrogation' if his home is crawling with

10   law enforcement agents conducting a warrant-approved search.  He may not feel that he can

11   successfully terminate the interrogation if he knows that he cannot empty his home of his

12   interrogators until they have completed their search."  *Craighead*, 539 F.3d at 1083.

13          The Ninth Circuit in *Craighead* adopted a four factor test to help courts determine whether

14   an interrogation that takes place inside the home is "custodial" and must be preceded by *Miranda*

15   warnings.  Court should consider "(1) the number of law enforcement personnel and whether they

16   are armed; (2) whether the suspect was at any point restrained by physical force or by threats; (3)

17   whether the suspect was isolated from others; and (4) whether the suspect was informed that he was

18   free to leave or terminate the interview, and the context in which those statements were made."  *Id.*

19   at 1084.

20          In *Craighead*, eight law enforcement officers representing three different agencies went to

21   the defendant's house at 8:40 in the morning to execute a warrant to search for child pornography.

22   *Id*. at 1078.  One of these officers said that two officers wanted to talk to the defendant; they "told

23   him that he was not under arrest, that any statement he might make would be voluntary . . . that he

24   would not be arrested that day regardless of what information he provided" and "that he was free to

25   leave."  *Id*.  They took the suspect to a storage room and closed the door so they could have a private

26   conversation.  *Id*.  The agents questioned the defendant for approximately twenty to thirty minutes,

27   "did not make any threats or promises to induce Craighead to speak," and "did not use any force."

28   *Id*. at 1079.  No *Miranda* warnings were given before the agents spoke with Craighead.  At the end

1    of the interview, he was not arrested and the government did not indict Craighead until seven months

2    later.  *Id.* at 1079-80.  The district court denied a motion to suppress, but the Ninth Circuit reversed.

3            Analyzing under the four factor test detailed above, the Ninth Circuit concluded Craighead

4    was in "custody" at the time of the interrogation.  It noted that although the agents told Craighead he

5    was free to go, Craighead was nonetheless in "custody" because his "home had become a police-

6    dominated atmosphere," and he "reasonably believed that there was simply nowhere for him to go."

7    *Id*. at 1089.  Since he was in custody, the absence of *Miranda* warnings meant that the interrogation

8    should have been suppressed.

9            Mr. Hammond's case is identical to the facts in *Craighead*.  Under the four *Craighead* factors,

10   it is clear Mr. Hammond was in "custody" and should have been informed of his *Miranda* rights.

11   Since he was interrogated without being advised of these rights, his statements should be suppressed.

12   **1.      Seventeen Law Enforcement Personnel from Four Different Agencies Created a**
         **Police Dominated Presence in Mr. Hammond's Apartment.**

13

14           The Ninth Circuit in *Craighead* noted that "the presence of a large number of visibly armed

15   law enforcement officers goes a long way towards making the suspect's home a police-dominated

16   atmosphere" for several reasons.  539 F.3d. at 1085.  First, "they may fill the home such that there

17   are no police-free rooms or spaces to which the suspect may retreat should he wish to terminate the

18   interrogation."  *Id.* at 1084.  Second, when law enforcement outnumber the suspect, he "may

19   reasonably believe that, should he attempt to leave, he will be stopped by one of the many officers

20   he will encounter on the way out."  *Id.* at 1084-85.  Third, the person may believe "the large number

21   of officers was brought for the purpose of preventing his departure."  *Id.* at 1085.  And finally, "if

22   the suspect sees the officers unholstering their weapons within his home, the suspect may reasonably

23   believe that his home is no longer safe from the threat of police force."  *Id.*  Thus, in *Craighead*, the

24   presence of eight law enforcement officers from three different law enforcement agencies was an

25   important fact in the Court's conclusion that a reasonable person would feel his home was dominated

26   by law enforcement who came "prepared for a confrontation."  *Id.*

27           Here, the number of law enforcement doubled that in *Craighead*.  There were seventeen law

28   enforcement agents, some of whom were visibly armed, that conducted the search of Mr.

-8-

1   Hammond's residence.  The agents came from four different law enforcement agencies: twelve FBI

2   agents, two U.S. Postal Inspectors, one Contra Costa County District Attorney Senior Investigator,

3   and two marked Richmond police department cars (presumably with Richmond police officers).  *See*

4   Exh. A.  The overwhelming law enforcement presence in Mr. Hammond's small three bedroom

5   apartment clearly made it a "police-dominated atmosphere" that supports finding Mr. Hammond was

6   in "custody."  *Craighead*, 539 F.3d at 1085.

7   **2.       Mr. Hammond Was Restrained By Handcuffs and Escorted at All Times.**

8   Regarding physical restraint, *Craighead* explained the relevant inquiry was "whether the

9   suspect was *at any point* restrained, either by physical force or threats."  *Craighead*, 539 F.3d at 1085

10  (emphasis added).   The court also explained that "[r]estraint amounting to custody may also be

11  inferred where law enforcement officers permit the suspect to move around the house for brief

12  periods but insist on escorting and monitoring him at all times."  *Id.*; *see also United States v.*

13  *Gladney*, 2009 WL 175157, *7, (C.D. Cal. Jan. 23, 2009) (Whaley, D.J.) (defendant in custody at

14  home even after handcuffs removed because "two FBI agents were guarding him at all times during

15  the questioning").

16  In *Craighead* itself, the Court found that although Craighead was "not handcuffed or

17  physically restrained," it was nonetheless reasonable for him "to believe he was under guard"

18  because he was escorted to a back storage room, the door was closed and an armed detective was

19  "leaning with his back to the door in such a way as to block Craighead's exit from the room."

20  *Craighead*, 539 F.3d at 1086.  Under these circumstances, "his freedom of action was restrained in

21  a way that increased the likelihood that Craighead would succumb to police pressure to incriminate

22  himself."  *Id.*   Critically, the Court credited Craighead's testimony that he was intimidated by the

23  detective's presence because he "represents law enforcement" and was armed.  *Id.*

24  Mr. Hammond's felt the same intimidation.  He—along with his family members, including

25  his fourteen year old niece—were handcuffed when the FBI entered the home to execute the search.

26  Exh. B at ¶¶ 4-5, 13.  Although the handcuffs were taken off for Mr. Hammond's family members

27  after several minutes, Mr. Hammond remained handcuffed until the agents interrogated him in his

28  bedroom.  Mr. Hammond was not wearing a shirt and the interrogation took place behind closed

-9-

1    doors.  *Id.* at ¶¶ 3, 10.  At least two of the agents in the bedroom had holstered firearms visible to

2    Mr. Hammond.  *Id.* at ¶ 11.  Those same two agents leaned against the wall that contained Mr.

3    Hammond's door, blocking him from leaving the room.  *Id.* at ¶¶ 10-11.  Agent Basanez, who was

4    Mr. Hammond's primary interrogator, sat near Mr. Hammond's bed and questioned him.  *Id.* at ¶ 11.

5    The agents never left Mr. Hammond unsupervised and Agent Basanez told Mr. Hammond that

6    "we're just going to have somebody kind of hanging out with you just for our safety."  Exh. C at 62.

7    This show of presence and control would intimidate any reasonable person, and especially Mr.

8    Hammond.  After all, the agents told Mr. Hammond they knew he was a registered sex offender who

9    did not feel like he could leave without talking to the officers.

10           While there is nothing inherently wrong with law enforcement controlling a suspect and a

11   potential crime scene, there are consequences for that decision.  The Ninth Circuit—quoting the First

12   Circuit—noted that although "physical control of the suspect will be necessary to preserve evidence

13   and protect the safety of the agents," the correct course is to either "postpone the interrogation until

14   a non-custodial moment, or to Mirandize [the suspect]," which "would have protected both the

15   defendant's constitutional rights and the officer's legitimate law enforcement needs."  *Craighead*,

16   539 F.3d at 1086 (quoting *United States v. Mittel-Carey*, 493 F.3d 36, 40 (1st Cir. 2007) (quotations

17   omitted)); *see also United States v. Perez*, 2012 WL 2935657, *3 (D. Guam Jul. 17, 2012) (Tydingco-

18   Gatewood, D.J.) (fact that officers needed to handcuff defendant to do a safety sweep "does not

19   lessen the tendency to make a reasonable person believe he is in custody.").  The agents' legitimate

20   decision to restrain Mr. Hammond meant that he was in "custody."

21           **3.      Mr. Hammond Was Isolated From Family Members During Questioning.**

22           The Supreme Court in *Miranda* itself noted that "the principal psychological factor

23   contributing to a successful interrogation is privacy—being alone with the person under

24   interrogation."  *Miranda*, 384 U.S. at 449.  Thus, isolation is not just "the crucial factor that would

25   tend to lead a suspect to feel compelled to provide self-incriminating statements," but "one of the

26   distinguishing features of a custodial interrogation."  *Craighead*, 539 F.3d at 1086-87 (citing

27   *Miranda*, 384 U.S. at 445-46).

28

1    Here, there is no question Mr. Hammond was isolated from his family.  Although initially

2    placed near his family, first in the front porch then in the family room, the agents eventually isolated

3    Mr. Hammond from his family members when they interrogated him.  Exh. B at ¶¶ 5-9.  First, his

4    mother was taken into her own room to be questioned behind closed doors.  *Id.* at ¶ 8.  Then Mr.

5    Hammond was separated from his sister and niece, who were sitting in the living room with Mr.

6    Hammond, when he was questioned in his bedroom.  *Id.* at ¶¶ 8-9.  The door of the bedroom was

7    closed and Mr. Hammond was alone with three other armed agents.  *Id.* at 10-11.  This supports a

8    finding that Mr. Hammond was in "custody."

9    **4.      Although Told He Could Leave, a Reasonable Person in Mr. Hammond's**
             **Position Would Not Have Felt Free to Leave.**

10

11    Although statements that a suspect are free to leave and will not be arrested suggest a person

12    is not in custody, the "mere recitation of the statement that the suspect is free to leave or terminate

13    the interview, however, does not render an interrogation non-custodial *per se*."  *Craighead*, 539 F.3d

14    at 1088.  After all, *Miranda* is not concerned with "whether the suspect was *told* that he was free to

15    leave" but whether "a reasonable person [would] have *felt* he or she was not at liberty to terminate

16    the interrogation and leave."  *Id.* (quoting *Thompson*, 516 U.S. at 112) (quotations omitted).  As one

17    district court has noted, "[j]ust because agents repeatedly used the magic words 'you are not under

18    arrest' and 'you are free to leave' [does] not make [a] gathering non-custodial."  *United States v.*

19    *Durazo*, 2014 WL 217895, *9 (D. Ariz. Jan. 21, 2014) (Collins, D.J.).  Instead, a reviewing court

20    must consider the agents' "delivery of these statements within the context of the scene as a whole."

21    *Craighead*, 539 F.3d at 1088.

22    In *Craighead*, the agents told the suspect that he was free to leave and would not be arrested

23    that day regardless of what the agents told him.  Nonetheless, the Ninth Circuit found Craighead

24    could have reasonably believed he was not free to leave.  That was because of the number and variety

25    of agents present in the house left Craighead with "doubt" as to whether the agent telling him he

26    could leave even had such authority.  Plus, the statement was given in a room with a single door

27    blocked by an armed agent, while six other agents were searching the house.  *Craighead*, 539 F.3d

28    at 1088-89.  Finally, Craighead explained he did not want to leave the officers alone with his

-11-

1    belongings. *Id.*

2         Similarly here, notwithstanding the fact the agents *told* Mr. Hammond he was not under arrest

3 and free to leave, he reasonably did not *feel* free to leave.[3]  Mr. Hammond was not wearing a shirt

4 during the interrogation.  Exh. B at ¶¶ 3, 15.  The most logical place for Mr. Hammond to go—

5 work—was unavailable to him because the FBI had seized his computer, which he needed for his

6 job. *Id.* at ¶ 14.  The agents even advised him to call in sick, thus actively precluding him from going

7 to one possible refuge from the FBI.  *Id.*

8         Moreover, because the agents blocked him from leaving his room during the interrogation

9 and told him they were going to escort him anywhere he went for their own safety, he could not

10 reasonably believe he was truly free to go as he pleased.  After all, he would have needed an officer's

11 permission to go anywhere; had he actually got up and left, it is likely an officer would have stopped

12 Mr. Hammond because Agent Basanez effectively told him he was a threat.  *See* Exh. C at 62 ("We're

13 just going to have somebody kind of hanging out with you just for our safety."); *see also United*

14 *States v. Warras*, 2015 WL 6736981, \*10 (D. Nev. May 18, 2015) (Ferenbach, M.J.), *R. & R. adopted*

15 20105 WL 6755275 (D. Nev. Nov. 4, 2015) (Dawson, D.J.) (escorting defendant at all times and

16 telling him he could not move without permission or supervision meant defendant's "right to leave"

17 was conditioned and had defendant "exercised his right to leave freely (i.e., without requesting

18 permission or supervision), he would have been stopped.").  He was not even free to do the simple

19 act of getting a shirt on without being supervised: Mr. Hammond was not able to open a dresser or

20 closet to get clothes until the officers searched and swept the closet or dresser.  Ultimately, the

21 overwhelming presence of the officers and the FBI's request that Mr. Hammond be escorted

22 throughout the apartment meant Mr. Hammond was deprived of "police-free rooms or spaces" where

23

24 [3] Several judges, including one here in the Northern District of California, have lamented the practice of advising suspects that they are not under arrest in situations where no person could reasonably believe they were free to terminate the encounter "on the theory that these magic words would allow

25 officers to keep questioning suspects without advising them of their *Miranda* rights, even if it is otherwise obvious that the suspects are in custody and therefore entitled to *Miranda*'s protective

26 admonitions." *United States v. Howard*, ___ F. Supp.3d ___, 2016 WL 97448, \*5 (N.D. Cal. Jan. 8, 2016) (Chhabria, D.J.) (citing *Smith v. Clark*, 612 F. App'x 418, 424 (9th Cir. 2015) (Watford, J.,

27 concurring) and *Smith v. Clark*, 804 F.3d 983, 986-87 (9th Cir. 2015) (W. Fletcher, J., dissenting from denial of rehearing en banc)).

28

1    he could retreat to during the search. *Craighead*, 539 F.3d at 1084.

2          Just because the agents questioned Mr. Hammond in a professional tone and were not

3    aggressive with him does not mean he was not in custody. "However calm in demeanor and normal

4    in tone, the officers were *ever present*" and that is enough to find a person is in custody for purposes

5    of *Miranda* if the home has become a police dominated atmosphere under the *Craighead* factors.

6    *United States v. Richardson*, 36 F. Supp.3d 120, 129 (D.D.C. 2014) (Jackson, D.J.); *see also United*

7    *States v. Salabye*, 623 F. Supp.2d 1010, 1013-14 (D. Ariz. 2009) (Campbell, D.J.) (while agent was

8    "calm and courteous, [he] was clearly in control of the situation" and defendant therefore in custody);

9    *Warras*, 2015 WL 6736981, *13 ("The mere fact that Mr. Warras showed agents memorabilia or

10   made jokes is insufficient to conclude that his home was not police dominated.").

11   **B.     Since Mr. Hammond Was Subjected to Custodial Interrogation Without Being Advised**
         **of His *Miranda* Rights, His Verbal and Written Statements Must be Suppressed.**
12

13         Considering all four of the *Craighead* factors, it is clear Mr. Hammond was in custody and

14   should have been advised of his *Miranda* rights before being interrogated. Numerous courts applying

15   *Craighead* to facts similar to the ones here have reached the same result. *See, e.g., Mittel-Carey*,

16   493 F.3d at 39-40 (defendant in "custody" at home when questioned in his bedroom for ninety

17   minutes to two hours after executing an early morning search, defendant was accompanied by agents

18   the entire time, and agents repeatedly told the defendant he should speak to the FBI because

19   "individuals that cooperated with investigations at the outset…tended to fare better if a deal was to

20   be had later on down the road.'"); *United States v. McKany*, ___ F. App'x ___, 2016 WL 2587540

21   (9th Cir. May 5, 2016) (unpublished) (defendant in custody at home when fourteen agents were

22   searching home, defendant was initially handcuffed and his movements were "closely monitored and

23   controlled"); *United States v. Clymer*, 524 F. App'x 354, 355-56 (9th Cir. 2013) (defendant in

24   custody at home when eleven officers from six different agencies executed search warrant and

25   defendant "was not permitted to move unrestrained through his home"); *United States v. Blanford*,

26   467 F. App'x 624, 625 (9th Cir. 2012) (unpublished) (presenting defendant with "substantial

27   evidence of his guilt" supported finding of in-home "custody" to require *Miranda* warnings); *see*

28   *also Durazo*, 2014 WL 217895, *10 (defendant in custody at home when 30 agents from five

-13-

1  different agencies entered defendant's home in early morning and agents accompanied him

2  everywhere he went during the search).

3      Since Mr. Hammond was subjected to custodial interrogation but not advised of his *Miranda*

4  rights, all of his statements to the FBI—including his written confession—must be suppressed.

5  *Miranda*, 384 U.S. at 492.

6                                      **CONCLUSION**

7      For the reasons stated above, Mr. Hammond was in "custody" when interrogated by the FBI

8  on July 17, 2015.  Since the agents did not advise Mr. Hammond of his *Miranda* rights, any verbal

9  or written statement given by Mr. Hammond must be suppressed.

10

11  DATED:        August 4, 2016                          STEVEN G. KALAR
                                                          Federal Public Defender
12
                                                          _____/S/_____
13                                                        HANNI M. FAKHOURY
                                                          Assistant Federal Public Defender
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28