STEVEN G. KALAR
Federal Public Defender
HANNI M. FAKHOURY
Assistant Federal Public Defender
1301 Clay Street, Suite 1350N
Oakland, CA 94612
(510) 637-3500
hanni_fakhoury@fd.org

Attorneys for DUMAKA HAMMOND

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                        Plaintiff,<br><br>        v.<br><br>DUMAKA HAMMOND,<br><br>                        Defendant. | CR 16-102-JD<br><br>DEFENDANT'S REPLY TO UNITED STATES' RESPONSE TO MOTION TO SUPPRESS STATEMENTS<br><br>Date:  September 14, 2016<br>Time: 10:30 a.m. |

1

## **TABLE OF CONTENTS**

2

3   INTRODUCTION ...................................................................................................... 1

4   ARGUMENT .......................................................................................................... 2

5   A.   The Correct Custody Factors to Consider For In-Home Interrogations Are those in
6        *Craighead*, not *Bassignani*. .................................................................... 2

7   B.   Mr. Hammond Was Clearly in "Custody" and Should Have Been Advised of His
     *Miranda* Rights. .................................................................................... 4

8   C.   Any Factual Disputes Must Be Resolved With an Evidentiary Hearing. ............................ 10

9   CONCLUSION ....................................................................................................... 10

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## TABLE OF AUTHORITIES

*Coomer v. Yukins*, 533 F.3d 477 (6th Cir. 2008) ................................................................. 3

*Miranda v. Arizona*, 384 U.S. 436 (1966) ................................................................. *passim*

*United States v. Bassignani*, 575 F.3d 879 (9th Cir. 2009) ........................................ 2, 3, 4

*United States v. Beraun-Panez*, 812 F.2d 578, *as modified*, 830 F.2d 127 (9th Cir. 1987) .............. 3

*United States v. Booth*, 669 F.2d 1231 (9th Cir. 1981) ....................................................... 3

*United States v. Clymer*, 524 F. App'x 354 (9th Cir. 2013) (unpublished) .................................. 4, 8

*United States v. Craighead*, 539 F.3d 1073 (9th Cir. 2008) ....................................... *passim*

*United States v. Crawford*, 372 F.3d 1048 (9th Cir. 2004) (en banc) ....................................... 3

*United States v. Durazo*, 2014 WL 217895 (D. Ariz. Jan. 21, 2014) (Collins, D.J.) ....................... 9

*United States v. Eaton*, 954 F. Supp. 2d 646 (W.D. Mich. 2013) (Bell, D.J.) ................................ 3

*United States v. Gladney*, 2009 WL 175157 (C.D. Cal. Jan. 23, 2009) (Whaley, D.J.) .................. 6

*United States v. Hayden*, 260 F.3d 1062 (9th Cir. 2001) ..................................................... 3

*United States v. Howard*, 2016 WL 97448 (N.D. Cal. Jan. 8, 2016) (Chhabria, D.J.) ..................... 9

*United States v. Kim*, 292 F.3d 969 (9th Cir. 2002) .......................................................... 3

*United States v. McKany*, 2016 WL 2587540 (9th Cir. May 5, 2016) (unpublished) ................... 3, 8

*United States v. Nguyen*, 2016 WL 2593893 (N.D. Cal. May 5, 2016) (Freeman, D.J.) .................. 3

*United States v. Richardson*, 36 F. Supp.3d 120 (D.D.C. 2014) (Jackson, D.J.) .............................. 9

*United States v. Salabye*, 623 F. Supp.2d 1010 (D. Ariz. 2009) (Campbell, D.J.) ........................... 9

*United States v. Saunders*, 2015 WL 9269968 (N.D. Cal. Dec. 21, 2015) (Koh, D.J.) .................... 3

*United States v. Walczak*, 783 F.2d 852 (9th Cir. 1986) .................................................. 10

*United States v. Warras*, 2015 WL 6736981 (D. Nev. May 18, 2015) (Ferenbach, M.J.)

*R. & R. adopted* 20105 WL 6755275 (D. Nev. Nov. 4, 2015) (Dawson, D.J.) ................................ 9

*United States v. Wolf*, 472 F. App'x 548 (9th Cir. 2012) (unpublished) ...................................... 4

1

**INTRODUCTION**

2      In its response to Mr. Hammond's motion to suppress, the government does not contest the

3 most significant facts demonstrating Mr. Hammond was in "custody" and should have been advised

4 of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966).  The government does not contest that

5 seventeen law enforcement officers from four different agencies executed a search warrant at Mr.

6 Hammond's home in the early morning.  *See* Doc. 30, Defendant's Motion to Suppress Statements,

7 Exhibit A, July 28, 2015 FBI 302 Report of Investigation ("FBI 302").  It does not dispute that Mr.

8 Hammond and his family, including his fourteen year old niece, were handcuffed and escorted to the

9 front porch of the house.  *See* Doc. 30, Defendant's Motion to Suppress Statements, Exhibit B,

10 Declaration of Dumaka Hammond ("Hammond Dec.") at ¶¶ 2-5.  It does not dispute that Mr.

11 Hammond was interrogated without a shirt on.  Hammond Dec. at ¶¶ 3, 15.  The government does

12 not challenge the fact there were firearms present when the agents executed the search warrant, and

13 that at least two firearms were in Mr. Hammond's small bedroom when he was interrogated by two

14 FBI agents.  *See* Doc. 35-1, Declaration of Special Agent Brian E. Lester in Support of United States'

15 Response to Defendant's Motion to Suppress Statements ("Lester Dec.") at ¶ 5.  And the government

16 makes no effort—because it cannot—to challenge Agent Basanez's statement to Mr. Hammond that

17 the FBI was "going to have somebody kind of hanging out with you just for our safety," a statement

18 that clearly meant Mr. Hammond did not have freedom of movement.  Doc. 30, Defendant's Motion

19 to Suppress Statements, Exhibit C, Transcript of July 17, 2015 Interrogation of Dumaka Hammond

20 ("Transcript") at 62.  The government concedes Mr. Hammond was "interrogated" and that no agent

21 advised Mr. Hammond of his *Miranda* rights.  *See* Doc. 35, United States' Response to Motion to

22 Suppress Statements ("U.S. Oppo.") at 5-6.

23      The only response the government makes is that Mr. Hammond was not in "custody," arguing

24 that a "custodial interrogation cannot take place" when a defendant is interrogated in his bedroom in

25 a non-aggressive way and told he is free to leave.  U.S. Oppo. at 1.  That is flatly incorrect: the Ninth

26 Circuit has already found in nearly identical circumstances that a defendant interrogated in his home

27 and told he could leave was nonetheless in "custody" for purposes of *Miranda*.  *See United States v.*

28

-1-

*Craighead*, 539 F.3d 1073, 1089 (9th Cir. 2008).  Rather than confront this reality, the government turns a blind eye to the controlling Ninth Circuit case which establishes the standard for assessing whether an in-home interrogation is custodial, and instead relies on Ninth Circuit cases that analyze "custody" outside of a defendant's home.  *See* U.S. Oppo. at 5 (citing *United States v. Bassignani*, 575 F.3d 879 (9th Cir. 2009)); *see Bassignani*, 575 F.3d at 880 (interrogation took place in "a conference room at [defendant's] workplace").  When this Court applies the correct standard— *Craighead*—it is clear Mr. Hammond was in "custody" and his statements must be suppressed.

## ARGUMENT

### A.  The Correct Custody Factors to Consider For In-Home Interrogations Are those in *Craighead*, not *Bassignani*.

Inexplicably, the government's opposition almost completely ignores *Craighead*, the binding Ninth Circuit case that addressed a question "of first impression" that clearly governs this case: "under what circumstances under the Fifth Amendment does an interrogation by law enforcement officers in the suspect's own home turn the home into such a police-dominated atmosphere that the interrogation becomes custodial in nature and requires *Miranda* warnings?"  539 F.3d at 1077.  Or, in simpler terms, "how to apply the traditional *Miranda* inquiry to an in-home interrogation."  *Id.* at 1083.  The government does not mention, let alone discuss, the four factors *Craighead* identified as "relevant to whether the circumstances of Craighead's interrogation effected a police-dominated atmosphere."  *Id.* at 1084.  In fact, the government's only reference to *Craighead* is its quotation— twice—of the opinion's prefatory statement that "courts have generally been much less likely to find that an interrogation in the suspect's home was custodial in nature."  *See* U.S. Oppo. at 6; *see also id.* at 6-7 (citing *Craighead* for proposition that the fact interrogation took place in Mr. Hammond's home "weighs in factor of a determination that the interview was non-custodial in nature.").

But the whole point of *Craighead* was to confront the "analytical challenges" with applying *Miranda* safeguards during an interrogation that takes place at a suspect's home and to provide a framework for courts to use in assessing whether an in-home interrogation is custodial.  *Craighead*, 539 F.3d at 1083.  The government offers no explanation or justification for rejecting the factors

-2-

1    *Craighead* concluded were uniquely suited for analyzing in-home interrogations.

2         Instead, the government relies on the "five factors relevant to the custody determination"

3    identified by the Ninth Circuit in *United States v. Bassignani*, 575 F.3d 879 (9th Cir. 2009). *See* U.S.

4    Oppo. at 5-10.   But the interrogation in *Bassignani* took place "in a conference room at [the

5    defendant's] workplace," not in his home.  575 F.3d at 880.[1]  The five-factor test in *Bassignani* came

6    from other cases where the interrogation also took place somewhere other than the defendant's home.

7    *See United States v. Kim*, 292 F.3d 969, 974 (9th Cir. 2002) (interrogation at defendant's store);

8    *United States v. Hayden*, 260 F.3d 1062, 1066 (9th Cir. 2001) (interrogation in FBI building); *United*

9    *States v. Beraun-Panez*, 812 F.2d 578, 580 (9th Cir. 1987) (interrogation in remote, rural area), *as*

10   *modified*, 830 F.2d 127 (9th Cir. 1987).  The other Ninth Circuit cases relied on by the government

11   in its response suffer from the same flaw.  *See* U.S. Oppo. at 9-10 (citing *United States v. Crawford*,

12   372 F.3d 1048, 1051-52 (9th Cir. 2004) (en banc) (interrogation took place in FBI office); *United*

13   *States v. Booth*, 669 F.2d 1231, 1235 (9th Cir. 1981) (questioning during *Terry* stop on public

14   street)).[2]   In other words, the government relies on the "usual inquiry" that *Craighead* found

15   insufficient to "capture the uniqueness of an interrogation conducted within the suspect's home."

16   539 F.3d at 1082.

17        The Ninth Circuit has looked *exclusively* to the *Craighead* factors when considering whether

18   an in-home interrogation is "custodial" under *Miranda*.  *See, e.g., United States v. McKany*, 2016

19   WL 2587540, *1 (9th Cir. May 5, 2016) (unpublished) (reversing denial of suppression motion and

20   finding interrogation custodial based on *Craighead* factors alone); *United States v. Clymer*, 524 F.

21

22   _____

     [1]  The government also relies on a Sixth Circuit decision in a habeas case, which upheld the
     reasonableness of state court decisions finding the petitioner's in-home interrogation was not
23   custodial.  U.S. Oppo. at 6 (citing *Coomer v. Yukins*, 533 F.3d 477, 487 (6th Cir. 2008)).  But the
     Sixth Circuit's approach to analyzing in-home interrogations is different than the Ninth Circuit's
24   approach in *Craighead*.  *See United States v. Eaton*, 954 F. Supp. 2d 646, 650-51 & n.3 (W.D. Mich.
     2013) (Bell, D.J.) (relying on factors from prior Sixth Circuit cases to hold that in-home interrogation
25   was not custodial and rejecting defendant's suggestion to consider *Craighead*:  "the Court declines
     to follow a Ninth Circuit decision which contradicts an on-point, binding Sixth Circuit precedent.").

26   [2]  The district court decisions relied on by the government are also not on point.  *United States v.*
     *Nguyen*, 2016 WL 2593893 (N.D. Cal. May 5, 2016) (Freeman, D.J.) involved an interrogation of a
27   priest at his church.  *United States v. Saunders*, 2015 WL 9269968 (N.D. Cal. Dec. 21, 2015) (Koh,
     D.J.) involved an interrogation inside an FBI agent's car.

28
     _____
     DEFENDANT'S REPLY TO UNITED STATES' RESPONSE TO
     MOTION TO SUPPRESS STATEMENTS
     16-102-JD

1   App'x 354, 355 (9th Cir. 2013) (unpublished) (using *Craighead* factors alone to evaluate "whether

2   an interrogation occurring within a suspect's residence is custodial" and suppressing statements);

3   *United States v. Wolf*, 472 F. App'x. 548, 549 (9th Cir. 2012) (unpublished) (citing only *Craighead*

4   factors in "evaluating" whether defendant was in "'in custody' when interview in her home").

5          This Court should follow these Ninth Circuit decisions and use *Craighead*, not *Bassignani*,

6   to evaluate whether Mr. Hammond was in custody.

7   **B.     Mr. Hammond Was Clearly in "Custody" and Should Have Been Advised of His**
        **_Miranda_ Rights.**

8

9          Under *Craighead*, this Court must consider four factors to determine whether an interrogation

10  that took place inside the home is "custodial" and must be preceded by *Miranda* warnings: "(1) the

11  number of law enforcement personnel and whether they are armed; (2) whether the suspect was at

12  any point restrained by physical force or by threats; (3) whether the suspect was isolated from others;

13  and (4) whether the suspect was informed that he was free to leave or terminate the interview, and

14  the context in which those statements were made." 539 F.3d at 1084. As set forth in Mr. Hammond's

15  motion to suppress, he clearly was in "custody" under these factors.

16         *Craighead* noted "the presence of a large number of visibly armed law enforcement officers

17  goes a long way towards making the suspect's home a police-dominated atmosphere." 539 F.3d at

18  1085. Here, the number of officers doubled that in *Craighead*. There were seventeen law

19  enforcement officers from four different agencies, most of whom were visibly armed, that conducted

20  the search of Mr. Hammond's residence. *See* FBI 302.

21         The government does not dispute there were seventeen officers in Mr. Hammond's small

22  home but argues that Mr. Hammond's declaration suggests "he only saw 'at least six law enforcement

23  officers in the doorway entering the apartment'" and "does not otherwise state, suggest or allude to

24  Hammond being aware of the fact that there were 17 officers." U.S. Oppo. at 8 (quoting Hammond

25  Dec. at ¶ 4). The government misreads Mr. Hammond's declaration, which indicates that he saw "at

26  least" six officers, meaning he knew there were more but unsure of how many specifically.

27  Moreover, whether Mr. Hammond knew there were six officers or seventeen is beside the point;

28

custodial determinations for *Miranda* are objective.  *See Craighead*, 539 F.3d at 1082 (custody determination requires asking "whether a reasonable person in those circumstances would 'have felt he or she was not at liberty to terminate the interrogation and leave.'") (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)).  The undisputed fact that there were seventeen officers in Mr. Hammond's small home means it was objectively a "police-dominated atmosphere" that shows Mr. Hammond was in "custody." *Craighead*, 539 F.3d at 1085.[3]  After all, in *Craighead* the Ninth Circuit found the presence of eight officers—half as many as were in Mr. Hammond's apartment—objectively turned Craighead's home into a "police dominated atmosphere" which meant the defendant was in custody.  *Id.*

Regarding restraint, the government argues that "[c]ontrary to Mr. Hammond's statements, he was not handcuffed at any point during the interview."  U.S. Oppo. at 9 (citing Lester Dec. at ¶ 7).  But of course, Mr. Hammond never claimed he was handcuffed during the interview; his declaration clearly states the officers handcuffed Mr. Hammond when they first entered the apartment and took them off "a few minutes after they brought me into my bedroom" and before the interrogation began.  Hammond Dec. at ¶¶ 7-9.  More importantly, the government does not dispute—and confirms—that Mr. Hammond was handcuffed during the search.  *See* Lester Dec. at ¶ 7 ("Also prior to the interview, we removed the handcuffs from Mr. Hammond, as would be our practice unless we had a particular security concern.").  As the Ninth Circuit explained in *Craighead*, all that matters is "whether the suspect was *at any point* restrained, either by physical force or threats."  *Craighead*, 539 F.3d at 1085 (emphasis added).  In fact, the Ninth Circuit found Craighead was in "custody" even though the FBI "did not handcuff Craighead *at any point* while escorting him to the storage room nor during the interview that followed."  *Id.* at 1078 (emphasis added).

But more important than whether Mr. Hammond was handcuffed during the interrogation is whether Mr. Hammond's "freedom of action was restrained in a way that increased the likelihood" that he would "succumb to police pressure to incriminate himself."  *Id.* at 1086.  *Craighead* explained

---

[3] The government's complaint about Mr. Hammond's subjective understanding about the number of officers in the apartment is inconsistent with its position later on in its opposition that "Hammond's subjective statements about how he restrained felt [sic] are irrelevant to the court's analysis."  U.S. Oppo. at 10.

"[r]estraint amounting to custody may also be inferred where law enforcement officers permit the suspect to move around the house for brief periods but insist on escorting and monitoring him at all times."  *Id.* at 1085; *see also United States v. Gladney*, 2009 WL 175157, *7, (C.D. Cal. Jan. 23, 2009) (Whaley, D.J.) (defendant in custody at home even after handcuffs removed because "two FBI agents were guarding him at all times during the questioning").

The government never addresses, let alone challenges, the fact that Agent Basanez told Mr. Hammond he would be supervised at all times during the search.  The government asserts Mr. Hammond "asked the agents if they wanted to walk with him" to his car to retrieve a plastic smoking device.  U.S. Oppo. at 8.  But this was not Mr. Hammond volunteering to have the agents accompany him outside.  He could only go outside if the agents were with him because Agent Basanez told Mr. Hammond before they went outside that "[w]e're just going to have somebody kind of hanging out with you just for our safety."  Transcript at 62.  And it is clear that Agent Basanez was going to search Mr. Hammond's car for electronic storage devices, and he explained before they left the bedroom that once Mr. Hammond put a shirt on, "we'll go around the side and you can show me your car."  Transcript at 56.[4]  Thus, if he wanted to go outside, Mr. Hammond had no choice but to have the agents with him.  The government's response is conspicuously silent about Mr. Hammond's assertion that once he did sit outside to smoke, an agent stood at the bottom of the porch steps, blocking the gate to exit the apartment building.  Hammond Dec. at ¶ 17; *see* U.S. Oppo. at 8 ("Mr. Hammond was told that he was free to leave the house, enter his car and leave, go to a local store, *or take a smoke, as he in fact did towards the end of the recorded interview*.") (emphasis added).

Moreover, the government does not seriously challenge the fact that during the actual interrogation, Mr. Hammond was cornered in a room with at least two armed FBI agents.[5]  The

---

[4] Although the Richmond warrant did not authorize the search of Mr. Hammond's car specifically, it did authorize the search of any computer "storage medium," such as flash memory or USB drives, found in either the Richmond apartment or "any appurtenances to the real property" like a garage or driveway.  At Mr. Hammond's car, Agent Basanez asked Mr. Hammond for his USB drives in order to search them.  *See* Transcript at 64 ("Do you mind if we check those thumb drives?").

[5] Mr. Hammond believed there were three total agents in the room during the interrogation, while Agent Lester claims there was only two agents.  *Compare* Hammond Dec. at ¶ 11 ("Agent Basanez sat on the bed next to me for the interview.  There were two other agents in the room, standing against the wall that had the door on it.") *with* Lester Dec. at ¶ 3  ("Only two law enforcement officers participated in the interview of Mr. Hammond, SA Robert Basanez, as noted in the transcript, and

government claims Mr. Hammond was unaware that Agent Basanez was armed, but his declaration makes clear he could see multiple firearms.  *Compare* U.S. Oppo. at 9 ("Though law enforcement officers were predominantly armed, as would be expected in executing a search warrant, it appears Hammond was generally unaware of this fact.") *with* Hammond Dec. at ¶ 11 ("There were two other agents in the room, standing against the wall that had the door on it.  I could see that *these agents* were armed and had guns in their holsters.") (emphasis added).  The government suggests the fact that Agent Lester's firearm was concealed behind his clothing makes it less intimidating.  U.S. Oppo. at 9.  But a firearm concealed by clothing is as visible, functional, accessible and intimidating as a firearm not concealed by clothing; otherwise there would be no point in carrying it in the first place.

Rather than challenge Mr. Hammond's assertion that Agent Lester was blocking his exit from the bedroom, Agent Lester's declaration only confirms how cornered Mr. Hammond felt.  *See* Hammond Dec. at ¶ 11 (other agent "standing against the wall that had the door on it" and "[i]f I wanted to get up and leave, they would have needed to move out of the way so I could open the door.").  Agent Lester explained that he "was initially standing against the wall of the bedroom with the door on it…approximately two to three feet to the right of the door."  Lester Dec. at ¶ 4.  Since Mr. Hammond's "bedroom was small," that resulted in Agent Lester being perhaps "less than five feet away from [Mr. Hammond] when standing up against the wall."  *Id.*  Eventually, Agent Lester sat down in a chair closer to Agent Basanez and Mr. Hammond.  *Id.*  Thus, given the small size of the bedroom, Agent Lester would have needed to move out of the way if Mr. Hammond wanted to leave the room, even if Agent Lester was not standing directly in front of the door.

The third *Craighead* factor, isolation, supports Mr. Hammond, who was isolated from his family members in his bedroom during the interrogation.  The government's only response is to argue that "Mr. Hammond chose to be interviewed in the privacy of his bedroom."  U.S. Oppo. at 7.  But *Miranda* itself noted that "the principal psychological factor contributing to a successful interrogation is *privacy*."  *Miranda*, 384 U.S. at 449 (emphasis added).  Thus, isolation is "one of the

---

myself.").  But Agent Lester acknowledges "[i]t is possible that a third officer may have entered the room during any break in the interview."  Lester Dec. at ¶ 3.  And even if Mr. Hammond was wrong and there were only two agents, the presence of two armed FBI agents, one of whom was standing next to the door, was a restraint on Mr. Hammond's movement.

distinguishing features of a custodial interrogation." *Craighead*, 539 F.3d at 1086-87 (citing *Miranda*, 384 U.S. at 445-46). The government's argument that having the interrogation take place in Mr. Hammond's bedroom as a concession to him exemplifies the problem with applying the *Bassignani* factors to an in-home interrogation. A "reasonable person interrogated inside his own home may have a different understanding of whether he is truly free 'to terminate the interrogation' if his home is crawling with law enforcement agents conducting a warrant-approved search. He may not feel that he can successfully terminate the interrogation if he knows that he cannot empty his home of his interrogators until they have completed their search." *Craighead*, 539 F.3d at 1083.

The final *Craighead* factor is the one the government spends the most amount of time discussing. It stresses that Mr. Hammond was repeatedly told he did not have to answer questions and was free to leave and that "this case should not be an outlier where a defendant is found to be in custody nonetheless." U.S. Oppo. at 5. But finding a defendant in custody although told he did not have to answer questions and was free to leave is the exact conclusion the Ninth Circuit reached in *Craighead*. The court explained, the "mere recitation of the statement that the suspect is free to leave or terminate the interview, however, does not render an interrogation non-custodial *per se*." *Craighead*, 539 F.3d at 1088. Nor is *Craighead* an "outlier" decision; numerous courts have suppressed in home interrogations where the defendant was repeatedly advised he was free to leave. *See, e.g., United States v. Mittel-Carey*, 493 F.3d 36, 38 (1st Cir. 2007) (defendant in custody at home although agents told him "he did not have to respond to the agents' questions" and did not arrest him after completing search); *McKany*, 2016 WL 2587540, at *1 (defendant in custody at home although "officers informed McKany that he was free to leave or terminate the interview"); *Clymer*, 524 F. App'x at 355-56 (defendant in custody at home although "Clymer was told that he was not under arrest and was free to leave").

Rather than look at how many times the agents told Mr. Hammond he could leave, the Court must instead consider the "delivery of these statements within the context of the scene as a whole." *Craighead*, 539 F.3d at 1088. *Miranda* is not concerned with "whether the suspect was *told* that he was free to leave" but whether "a reasonable person [would] have *felt* he or she was not at liberty to

-8-

1   terminate the interrogation and leave." *Id.* (quoting *Thompson*, 516 U.S. at 112) (quotations omitted).

2         Notwithstanding how many times the agents *told* Mr. Hammond he was not under arrest and

3   free to leave, he objectively did not *feel* free to leave.[6]  The overwhelming presence of the officers

4   and the FBI's request that Mr. Hammond be escorted throughout the apartment meant Mr. Hammond

5   was deprived of "police-free rooms or spaces" where he could retreat during the search.  *Craighead*,

6   539 F.3d at 1084. The next logical place for Mr. Hammond to go—work—was unavailable because

7   the FBI had seized his computer, which he needed for his job.  *Id.* at ¶ 14.  The agents even advised

8   him to call in sick, encouraging him from going to one possible refuge from the FBI.  *Id.*

9         The FBI's decision to repeatedly tell Mr. Hammond he was free to leave seems predicated

10   "on the theory that these magic words would allow officers to keep questioning suspects without

11   advising them of their *Miranda* rights, even if it is otherwise obvious that the suspects are in custody

12   and therefore entitled to *Miranda*'s protective admonitions."  *United States v. Howard*, ___ F.

13   Supp.3d ___, 2016 WL 97448, *5 (N.D. Cal. Jan. 8, 2016) (Chhabria, D.J.) (citations omitted)).  As

14   one district court explained in granting a motion to suppress an in-home custodial interrogation,

15   "[j]ust because agents repeatedly used the magic words 'you are not under arrest' and 'you are free

16   to leave' [does] not make [a] gathering non-custodial."  *United States v. Durazo*, 2014 WL 217895,

17   *9 (D. Ariz. Jan. 21, 2014) (Collins, D.J.).

18         In short, considering all of the *Craighead* factors, Mr. Hammond was in "custody" and should

19   have been advised of his *Miranda* rights prior to any interrogation by the FBI.

20

21

22   [6] The government seizes Mr. Hammond's acknowledgement that the agents questioned Mr.
Hammond in a professional tone and were not aggressive with him to argue that he was not in
23   custody.  *See* U.S. Oppo. at 6.  But as explained in Mr. Hammond's motion to suppress, "[h]owever
calm in demeanor and normal in tone, the officers were *ever present*" and that is enough to find a
24   person is in custody for purposes of *Miranda* if the home has become a police dominated atmosphere
under the *Craighead* factors.  *United States v. Richardson*, 36 F. Supp.3d 120, 129 (D.D.C. 2014)
25   (Jackson, D.J.); *see also United States v. Salabye*, 623 F. Supp.2d 1010, 1013-14 (D. Ariz. 2009)
(Campbell, D.J.) (while agent was "calm and courteous, [he] was clearly in control of the situation"
26   and defendant therefore in custody); *United States v. Warras*, 2015 WL 6736981, *13 (D. Nev. May
18, 2015) (Ferenbach, M.J.) ("The mere fact that Mr. Warras showed the agents memorabilia or
27   made jokes is insufficient to conclude that his home was not police dominated."), *R. & R. adopted*
20105 WL 6755275 (D. Nev. Nov. 4, 2015) (Dawson, D.J.).

28

**C.**     <u>**Any Factual Disputes Must Be Resolved With an Evidentiary Hearing.**</u>

The majority of the facts are not in dispute and Mr. Hammond maintains that taking the uncontested facts from the declarations of Mr. Hammond and Special Agent Lester sufficiently demonstrates that he was in "custody."  But if the Court believes any factual dispute need be resolved in order to rule on the motion to suppress, it should hold an evidentiary hearing to resolve the conflict. *See generally United States v. Walczak*, 783 F.2d 852, 857 (9th Cir. 1986) (evidentiary hearing "required" if "moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in issue.").

<u>**CONCLUSION**</u>

For the reasons stated above and in Mr. Hammond's motion to suppress, he was in "custody" when interrogated by the FBI on July 17, 2015.  Since the agents did not advise Mr. Hammond of his *Miranda* rights, any verbal or written statement given by Mr. Hammond must be suppressed.


DATED:         August 25, 2016                 STEVEN G. KALAR
                                                  Federal Public Defender

                                                  _____/S/_____
                                                  HANNI M. FAKHOURY
                                                  Assistant Federal Public Defender